# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 20, 2010 Session

## STATE OF TENNESSEE v. KENNETH THOMPSON ANDERSON, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-C-2268     Monte Watkins, Judge**

---

**No. M2009-00494-CCA-R3-CD - Filed January 20, 2011**

---

Following a jury trial, Defendant, Kenneth Thompson Anderson, Jr., was convicted of eight counts of sexual battery by an authority figure and sentenced to an effective sentence of nine years. In this direct appeal, Defendant raises the following issues for review: 1) whether the trial court erred by refusing to allow testimony regarding the victim's past sexual behavior and preference for older men; and 2) whether the evidence is sufficient to support Defendant's convictions. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Kenneth Thompson Anderson, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and J.W. Hupp, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### Facts

We will refer to the minor victim by her initials. At trial, the victim, A.S., testified that in late 2005 and early 2006, she was 16 years old and a student at Smyrna High School. Defendant was her biology teacher. She described Defendant's class as a "fun class." She testified that in the Fall of 2005, she was upset over some issues she was having with her mother and turned to Defendant to talk about it. During one of her conversations with

Defendant at school after class, Defendant kissed her. Before the Christmas break, Defendant gave A.S. a cell phone, and he gave her a photograph of himself on the back of which he wrote, "To my girl who I love with all my heart, soon she'll be my wife, [Defendant]."

A.S. testified that on January 5, 2006, Defendant picked her up, and she "snuck out" of her house to go to his house. A.S. testified that Defendant's teenage daughters were at his house, and his 14-year-old daughter woke up while she was there, but later fell back asleep. Defendant and A.S. went to Defendant's bedroom where "he performed oral sex on [her], and [they] had sexual intercourse." A.S. testified that on January 7, 2006, her stepfather dropped her off at Hickory Hollow Mall, where she met Defendant, who drove her to his house, where they again had sexual intercourse. On January 14, 2006, Defendant picked her up again from the mall. After they dropped off her friend at her boyfriend's house, Defendant and A.S. rented a movie and got food from Burger King, which they took to Defendant's house. A.S. testified that they ate their food and watched the movie and then left to pick up the friend and drop her off at home. They returned to Defendant's house, where they had sexual intercourse. A.S. stayed the night at Defendant's house and slept in his bed. She testified that when she and Defendant woke up on the next morning, on January 15, they had sex again. She left her clothes at Defendant's house. A.S. testified that she was in love with Defendant and that Defendant was in love with her.

On cross-examination, A.S. testified that it was "not entirely true" that she was attracted to older men, and she acknowledged that she had been in a previous relationship with a man named Deon Lyons that had ended more than two years before her involvement with Defendant. She also testified that she knew Defendant only from having been in his biology class. She testified that her mother had learned of her relationship with Defendant and took away the cell phone that Defendant had given her. A.S. and her mother had a physical altercation and A.S. was placed in juvenile detention. In her initial statement to the Smyrna Police Department, while in detention, she did not disclose a sexual relationship with Defendant. When asked by Detective Adkins to submit to a medical exam, she refused, which A.S. testified was in an effort to protect Defendant.

Officer Kevin Cooley testified that he assisted in executing a search warrant of Defendant's home. When officers arrived at Defendant's residence, Defendant was not there. Defendant's vehicle was stopped in the area, and the items specified in the warrant, the victim's jeans and shirt, were found in Defendant's vehicle.

Defendant's wife, Janette Anderson, testified that she and Defendant had been married for 18 years, but they had been separated since September, 1998. She and Defendant have two daughters together, ages 16 and 18. At the time of the offenses, their daughters lived

with Defendant during the week and visited Mrs. Anderson on the weekends. She and Defendant lived within a two or three-minute drive from each other.

Kendra Anderson, Defendant's 18-year-old daughter, testified that in the Fall of 2005, she remembered her father waking her up in the middle of the night and taking her to her mother's house. She testified that she and Defendant sat down to talk, and Defendant took her cell phone away from her because he told her she had been "dishonest and sneaky." Subsequent to that incident, she called the number for the cell phone her father had taken from her, and a female answered. Miss Anderson testified that she met the victim in January, 2006, and she was aware of one occasion on which the victim came to Defendant's house. She did not see Defendant and the victim engage in any type of inappropriate conduct.

Defendant's youngest daughter testified that in early 2006, she was awakened by someone tapping her shoulder while she was sleeping at her father's house. She asked the person who woke her, "Are you [A.S.]?" A.S. replied, "yes," and she went back to sleep. She considered A.S. a "friend" of her dad's.

Detective Michael Adkins of the Metro Nashville Police Department testified that he assisted in executing a search warrant of Defendant's home. After stopping Defendant's vehicle and locating the victim's jeans and shirt inside, he obtained another warrant for Defendant's residence and found mapquest directions from Defendant's home to the home of Talesha Tucker, who was a friend of A.S. Detective Adkins also recovered Defendant's bedding from the dryer. Detective Adkins did not request DNA analysis of the victim's clothes or Defendant's bedding.

Joshua Smith testified that he was in Defendant's biology class with the victim. He testified that within his group of peers, the phrase "be my wife" had the connotation of friendship rather than an intention to marry. He testified that Defendant "would try to get on [students'] level and help [them] understand things a lot better, talk to [students] like. . . [they] talk to each other."

Defendant denied having had a sexual relationship with A.S., and he testified that his personal involvement with A.S. outside of his classroom was only to protect her. He testified that A.S. confided in him about problems in her home life, including physical altercations between her mother and stepfather. In one instance that A.S. described to Defendant, she was pushed while trying to intervene, but Defendant never reported any of those incidents described by the victim to any other authority. Defendant testified that he gave A.S. a cell phone before the Christmas break to use while she visited her father. Defendant testified that she continued to confide in him about her personal problems with her family, and he

described their relationship as "more than a teacher-student relationship. She was a friend of sorts, where I would talk to her concerning problems."

Defendant testified that A.S. called him one night very distraught, saying that she wanted to leave home. Defendant picked her up a block away from her house and drove her to his house. He testified that after they arrived at his house, Defendant introduced the victim to his youngest daughter, who, he testified, was not sleeping. According to Defendant, the victim then "made a bee-line" to his bedroom, which Defendant thought was "kind of odd." Defendant testified that she "started unbuttoning her blouse" and "started stripping." Defendant told her to stop. He then drove her back to where he had picked her up and dropped her off.

Defendant testified that he told A.S. on the following morning that the "situation that happened in [his] house [the previous night] will never repeat itself." He testified that on another occasion, he heard A.S. tell some classmates that she was going to spend the weekend at a friend's house, who lived in the vicinity of Deon Lyons, with whom Defendant knew that A.S. had "a problem." Defendant testified that he was driving around looking for Deon Lyons that weekend when A.S. sent him a text message asking him to pick her up at the mall. He met A.S. and her friend Talesha at the mall and drove them to Talesha's house, but A.S. stayed in his car, saying she wanted to "hang out and talk" and watch a movie at his house. Defendant and A.S. rented a movie and returned to Defendant's house. Defendant testified that around 11:30 p.m., A.S. received a phone call from Talesha, asking her to pick her up. Defendant and A.S. drove to where Talesha was, picked her up and dropped her off at another location. Defendant testified that A.S. wanted to talk to him some more, so they drove back to his house at around 1:00 a.m. Defendant testified that A.S. slept in his bed that night, and he slept on the couch. The following morning, Defendant drove her to Talesha's grandmother's house and dropped her off.

Defendant and A.S. exchanged several text messages, which Defendant attempted to explain. Defendant sent A.S. messages that read, "I love you," "You didn't know? I miss you like crazy, I can get used [sic] to having you with me," and "I want to marry you as soon as I can." Regarding those messages, Defendant testified that he "enjoy[s] the company of his students" and that he "told each and every student that [he] ever taught that [he] loved and respected each one of them." Defendant also testified that a text message he received from A.S. stating that her "upper thighs hurt" was because several students in his class had been "wrestling and horse-playing" and "passing licks back and forth." Defendant testified that his text message to A.S., "I want to marry you as soon as I can," was "slang" and that it was "only to show her that [he would] be there for her whenever she need[ed] [him]." Defendant admitted that he gave a photograph of himself to A.S. with the words, "to my girl who I love with all my heart, soon will be my wife," written on the back, but he testified that he gave

photographs of himself "to several different students" with "just stupid comments on the back of them." He did not intend for his comments to be taken literally.

*Relevancy of the Evidence*

Defendant asserts on appeal that the trial court unfairly limited the scope of defense counsel's cross-examination of the victim and the direct examination of Defendant with regard to the victim's knowledge of sexual matters and her preference for older men.

Tennessee Rule of Evidence 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. It is a rule of relevance, *see State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn. 1997).

Rule 412 provides, in pertinent part, as follows:

> (c) Specific instances of conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> > (4) If the sexual behavior was with persons other than the accused,
> >
> > > (i) to rebut or explain scientific or medical evidence, or
> > >
> > > (ii) *to prove or explain* the source of semen, injury, disease, or *knowledge of sexual matters*, or
> > >
> > > (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c)(4). (emphasis added).

At the hearing on Defendant's Rule 412 motion, A.S. testified that her sexual relationship with Defendant was consensual. She also testified that she had a sexual relationship with former boyfriend Deon Lyons and a man named Chauncey. She testified that she confided in Defendant about personal matters, including problems in her home life.

A.S. denied that she had a sexual relationship with a 40-year-old man who was, at the time of the hearing, being investigated for having had a sexual relationship with her. She testified that she learned of sexual matters from her sexual experiences prior to Defendant.

In an order denying Defendant's motion, the trial court found as follows:

> The Court also finds that the Tenn. R. Evid. 412 is a rule of exclusion and that the defendant did not establish the need for the evidence when the State has conceded that the victim has allegedly engaged in sexual behavior with another individual to prove sexual knowledge. Therefore, the evidence of prior sexual abuse and sexual encounters are not admissible. The defendant's motion for introduction of Tenn. R. Evid. 412 evidence is DENIED.

The State argues that evidence of the victim's past sexual behavior was not relevant in that the victim was not a young child as contemplated by Rule 412, and there was no suggestion that she could only have acquired knowledge about sexual matters from the defendant. However, as the State also points out, Defendant did not offer the evidence for the purpose of showing that the victim had knowledge of sexual matters, but rather to demonstrate the victim's alleged attraction to older men.

In the case *sub judice*, the victim was 16 years of age at the time of the offense and 18 years old at the time of trial, rather than a very young child as contemplated by section (c)(4)(ii) of Rule 412. *See* Tenn. R. Evid. 412, Advisory Comm'n Cmts. ("This provision also permits proof of the source of knowledge of sexual matters. It will most frequently be used in cases where the victim is a young child who testified in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.") Moreover, the jury heard evidence of A.S.'s knowledge of sexual matters. A.S. testified at trial that she had been involved in at least one relationship with an older man, Deon Lyons, and Defendant testified that A.S. told him that she had been sexually active before he knew her.

Finally, Defendant's stated purpose for offering the evidence was to show the victim's alleged attraction to older men in order to support his defense that he did not "use[ ] his position of authority to engage in sexual relations with [A.S.]," as stated in Defendant's motion. This was also Defendant's argument to the trial court for admitting the evidence. Defendant's stated purpose for admitting the evidence is not among the purposes allowed under Rule 412. Furthermore, the victim's lack of consent is not an element of the crime for which Defendant was convicted. The offense of sexual battery by an authority figure does

not require that the minor victim withhold consent. *See* Tenn. Code Ann. § 39-13-527. Therefore, the evidence is neither relevant, nor was it offered for a purpose stated in the rule. We conclude that the trial court properly excluded the evidence.

*Sufficiency of the Evidence*

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The judgments reflect that Defendant was convicted on eight counts of sexual battery by an authority figure, which is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he victim was, at the time of the offense" between the ages of 13 and 17 years old, and "[t]he defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact." *See* Tenn. Code Ann. § 39-13-527.

Defendant argues that the proof at trial was insufficient to show that he used his position of authority, as the victim's teacher, to accomplish the sexual contact with the victim. On appeal, Defendant points to the following trial testimony from the victim:

> [Defense counsel]:  [A.S.], once again, did [Defendant] use his position as a biology teacher to influence you in any way to have sex with him?
>
> [A.S.]:  No.
>
> [Defense counsel]:  Pardon?

[A.S.]:              No.

[Defense counsel]:   So, the fact that he was a biology teacher had nothing
                     to do with your relationship. Isn't that correct?

[A.S]:               It depends on how you look at it.

[Defense counsel]:   Well, if you met the man, let's just say at Kroger or
                     something, all right [sic]? And y'all started talking
                     and you liked him, that could have easily been the
                     same situation as having met him in the classroom?

[A.S.]:              No.

[Defense counsel]:   No. Well, as far as him being your biology teacher, all
                     right [sic], he never said you had to socialize with him
                     or do anything with him sexually or otherwise in order
                     to get a grade. Correct?

[A.S.]:              Correct.

[Defense counsel]:   He never put any pressure on you to socialize with
                     him or to have a relationship with him in order to have
                     a good grade or have anything to do with school.
                     Right?

[A.S.]:              Right.

[Defense counsel]:   What you did with him – what you claim you did with
                     him – was completely and absolutely voluntary. Isn't
                     that right?

[A.S.]:              Correct.

The State responds that the victim also testified that it was through the teacher-student relationship that Defendant gained the victim's trust, and she began confiding in him about problems in her family. The victim ultimately stated that the only way Defendant was able to have a sexual relationship with her was through his relationship with her as a teacher.

Defendant also asserts that the evidence is insufficient to support his convictions because the sexual contact did not take place at the school. However, nothing in the statute requires that the sexual activity occur at the school, or other place that is the source of the defendant's authority. In *State v. Farmer*, this Court held that a defendant need not use his position of authority to "force" sexual contact with the victim, but rather, the statute prohibits a defendant from using such power to "accomplish" the sexual contact. In that case, this Court relied on the following definition of "accomplish": "Without a definition provided by the legislature, we turn to the plain meaning of accomplish, which is '1: to bring about (a result) by effort . . . 2: to bring to completion: fulfill.' Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/accomplish (last visited July 21, 2008)." *State v. Farmer*, No. M2007-01553-CCA-R3-CD, 2008 WL 3843847 at *7 (Tenn. Crim. App. At Nashville, June 17, 2008), *perm. to app. denied*.

When viewed in a light most favorable to the State, the evidence establishes that Defendant used his position of trust to accomplish sexual contact with the victim. A.S. testified that she had sexual contact with Defendant. Defendant and A.S. testified that, during the time period in which A.S. testified the sexual contact occurred, Defendant was her biology teacher. Defendant gained A.S.'s trust by allowing her to confide in him about her family problems, and he endeared himself to her through his many provocative and inappropriate messages to her. According to Defendant's own testimony, even after A.S.'s behavior indicated that she was interested in an inappropriate relationship with him, his actions fostered such a relationship when he spent time alone with her and brought her to his house, where he allowed her to spend the night. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE